IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PULSE TECHNOLOGIES, INC.,

               Plaintiff,              CV-07-65-ST

     v.                              FINDINGS OF FACT AND
                                    CONCLUSIONS OF LAW

JEDEDIAH L. DODRILL,

               Defendant.

STEWART, Magistrate Judge:

## <u>INTRODUCTION</u>

On October 12, 2006, plaintiff, Pulse Technologies, Inc. ("Pulse"), filed this lawsuit against defendant, Jedediah L. Dodrill ("Dodrill"), in the United States District Court for the Eastern District of Pennsylvania. Pulse is a manufacturer and supplier of medical device components, instruments, and equipment. Pulse employed Dodrill from March 18, 2002, until November 15, 2005, pursuant to an Employment Agreement originally executed March 4, 2002,

and amended March 4, 2005.  The Employment Agreement contains a two-year restrictive

covenant prohibiting Dodrill from engaging "in any manner . . . in any . . . business which

engages in contract manufacturing of machine components with a customer base predominately

in the medical field" (the noncompetition clause) and from "doing business with, or interfer[ing]

with any customer or prospective customer . . . who was a customer or prospective customer on

the date of termination . . . or at any time within two (2) years prior to that date" (the

nonsolicitation clause). Exhibit 1(Employment Agreement), ¶¶ 9(b) & (c).  Pulse alleges that

after being terminated, Dodrill violated this restrictive covenant by representing Pulse's

competitor, RMS Company ("RMS"), and by actively soliciting Pulse's Western United States

customer base.  As a result, Pulse alleges two claims against Dodrill for breach of contract and

injunctive relief.

On December 7, 2006, this case was transferred to the District of Oregon pursuant to

28 USC § 1406(a), upon a finding that venue was not proper in the Eastern District of

Pennsylvania.  *See* Memorandum and Order (docket #22).  On February 7, 2007, Dodrill

responded to the Complaint by alleging counterclaims against Pulse for *quantum meruit* and

unjust enrichment.  Defendant's Answer, Affirmative Defenses, and Counterclaims (docket #35).

In those counterclaims, Dodrill alleges that he earned, but was not paid, commissions of

approximately $350,000.00 on over $16 million in sales between January and November 2005.

Pulse is a Pennsylvania corporation with its principal place of business in Quakertown,

Pennsylvania.  Dodrill is a citizen of Oregon.  The amount in controversy exceeds $75,000,

exclusive of interest and costs.  Thus, this court has diversity jurisdiction under 28 USC § 1332.

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

At a hearing held on March 8, 2007, the court received testimony and exhibits, in addition to the exhibits submitted both in support and in opposition to the motion, and heard arguments of counsel. After reviewing the evidence, this court makes the following findings of fact and conclusions of law:

## <u>FINDINGS OF FACT</u>

Pulse is a manufacturer and supplier of components, instruments, and equipment which it sells to original equipment manufacturers (OEMs) of medical devices. Pulse uses a Swiss screw machine, milling equipment, and special software (computerized numerical control) to shape raw metal into a particular component as specified on a drawing. It also is only one of three companies which cuts platinum using a confidential method to reclaim waste. Pulse's machined components are predominately used in cardiac rhythmic management, but also are used in defibrilators, bone screws, electrodes and other medical and dental devices. Pulse has approximately 15 direct competitors, including RMS Company ("RMS") located in Minnesota and Johnson Matthey, Stellar, and Accellant located in California.

Pulse forms relationships with customers over a period of years and develops leads through trade shows and other means to identify engineers working on a new device and heads of purchasing in order to solicit a quotation for a specific component. Obtaining a sale takes from 18 to 24 months. Pulse may manufacture multiple components of particular devices and competes to obtain as many machined components as possible on identical devices.

Because of the competitive advantage obtained by rushing a new device to market, the delivery time and price of Pulse's components are critical.  Pulse has a national customer base with approximately 52% of its revenue generated on the West Coast, 38% on the East Coast, 7% in the Midwest, and 3% in Europe and the South.

Since graduating from Oregon State University in 1998, Dodrill has worked only in the medical device industry and primarily with companies that sell medical components.  Before he was hired by Pulse, Dodrill worked first as a customer service representative and then as an outside sales person for Precision Wire Components ("PWC") in Oregon.  PWC manufacturers precision wire parts which it supplies to Pulse and other companies.  It does not directly compete with Pulse.  While at PWC, Dodrill established many valuable customer relationships in the Western and Upper Midwestern United States and by 2002 was earning an income of $40,000 to $45,000 per year.

In 2002, Frank Henofer, Jr. ("Henofer") was the Executive Vice President and a principal of Pulse.  Beginning in January 2002, Henofer and Dodrill began discussing the possibility that Dodrill might begin working for Pulse rather than for PWC.  On January 29, 2002, Dodrill sent Henofer a letter (Exhibit 2) seeking clarification of the terms of the position that they had been discussing.  Some time between February 5 and 7, 2002, Dodrill and Henofer discussed the issues raised in that letter while attending a trade show in California.  During that week, they verbally agreed on the terms of a position for Dodrill with Pulse which Dodrill verbally accepted on February 11, 2002.  On March 4, 2002, Dodrill received the Employment Agreement (Exhibit 1), which he executed and returned via overnight mail the same day.  Dodrill began working for Pulse on March 18, 2002, as a Regional Sales Manager.

Despite the fact that Dodrill and Henofer never discussed any restrictive covenants during their conversations, the Employment Agreement contains the following clause:

> 9.  Noncompetition and Nonsolicitation
>
> b.  In the event Employee's employment with Company is terminated for any reason whatsoever, whether such termination is initiated by Company or by Employee, or otherwise occurs pursuant to the terms of this Agreement, then, for a period of two (2) years after termination of his employment, **Employee agrees that he shall not engage, either directly or indirectly, in any manner or capacity, as principal, agent, partner, officer, director, employee, consultant or otherwise, in any Restricted Business (as hereinafter defined) anywhere in the United States.  The term "Restricted Business" shall mean a business which engages in contract manufacturing of machine components with a customer base predominately in the medical field.**
>
> c.  In the event Employee's employment with Company is terminated for any reason whatsoever, whether such termination is initiated by Company or by Employee, or otherwise occurs pursuant to the terms of this Agreement, then, for a period of two (2) years after termination of his employment, **Employee agrees that Employee will not alone, or in any capacity with another, directly or indirectly canvas, solicit, service, accept business from, do business with, or in any way interfere or attempt to interfere with any customer or prospective customer of Company who was a customer or prospective customer on the date of termination of Employee's employment or at any time within two (2) years prior to that date.  In addition, Employee will not, for a period of two (2) years after termination of his employment, encourage or entice any employee of Company to accept employment from, or serve in a similar capacity with, any other company or other concern which is engaged in a business practice or activity similar to or competitive with the business of the Company.**

Exhibit 1, ¶ 9 (emphasis added).

On March 21, 2002, Dodrill also signed an Employee Acknowledgment Form (Exhibit 3), acknowledging that he was an at-will employee.  Pulse provided some initial training to

5 -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

Dodrill, and Henofer accompanied Dodrill on two or three sales trips, introducing him to Pulse

customers such as St. Jude Medical and WL Gore.

During his tenure at Pulse, Dodrill's primary role was to generate new customer

relationships and goodwill, as well as to maintain and enhance Pulse's business. Exhibit 8.

Dodrill gained an intimate knowledge of Pulse's confidential and proprietary information

regarding its sales activities, objectives, strategies, strengths and weaknesses, threats, and

opportunities. *See* Exhibits 4 & 14. Dodrill had access to password-protected customer contact

information, factory overhead rates, engineering set-up, and specific drawing and pricing

requirements of Pulse's customers. This information is not publicly available and was obtained

by Pulse through the investment of significant expense and time. However, Dodrill is not an

engineer and did not operate any machinery.

During his employment with Pulse, Dodrill worked and operated in Oregon 70% of the

time and traveled within the Western and Upper Midwestern United States[1] approximately 30%

of the time. Dodrill was a very good salesman who consistently met or exceeded his sales goals

and had a knack for finding high margin business.

Joseph Rosato Jr ("Rosato") became Pulse's Vice President in March 2003 and President

in January 2004. At that time, Pulse's sales totaled about $6 million.

Two years later, in late February 2005, Rosato asked the three Regional Sales Managers,

including Dodrill, to sign an "Amended and Restated Schedule 'A' to Employment Agreement

by March 4, 2005. Exhibit 5. That document (Exhibit 6) changed the title of Dodrill's position

from "Regional Sales Manager" to "Technical Product Specialist," increased Dodrill's base

---

[1] The first Schedule A executed by Dodrill identifies his territory as "the non-exclusive territory to include WA, OR, CA, AZ, NM, UT, ID, MT, WY, CO, KS, NB, SD, ND, MN, WI, MI, IA, IL, [and] MO."

salary from "$2,115.39 BiWeekly" to "$2,145.00 Bi Weekly – eligible for annual

merit/inflationary increases per company policy," and reflected the current changes in

compensation by adding a provision for payment of sales expenses and substituting for the

"Commission" provision two substantially different sections entitled "Sales Bonus and Payment

Terms" and "Incentive Compensation based on Key Performance Measures."  Although disputed

by Rosato, Dodrill claims that he and another Regional Sales Manager, David Bell, were told

that they had to sign the Amended and Restated Schedule A if they wanted to remain employed.

Dodrill signed the Amended and Restated Schedule "A" on March 4, 2005, accompanied by a

letter expressing his desire for a more secure employment relationship.  Exhibit 7.  One of the

three Regional Sales Managers, Dennis Jones, refused to sign the Amended and Restated

Schedule A and was not terminated, although he resigned shortly thereafter in June 2005.


        In May 2005, Pulse hired a new Sales Manager, Robert Madigan ("Madigan"), who

became Dodrill's direct supervisor.  As an at-will employee, Dodrill became concerned that as

his sales and commissions increased, he was more at risk of being terminated.  Therefore, during

the next few months, Dodrill engaged with Pulse in what he thought were negotiations for a

long-term contract that protected him from termination without cause.  In October 2005, Pulse

celebrated the largest bookings month that it had ever had, and approximately 85% of those

bookings came from Dodrill's direct efforts.  At that time, Dodrill was far exceeding his sales

goals and his earnings were about $150,000, nearly twice those of the prior year.

        However, on November 15, 2005, Madigan delivered to Dodrill a letter of termination

and a Severance Agreement and General Release.  Exhibit 9.  The letter explained that while

Dodrill had "made remarkable improvements in generating sales – to the point that [he was] a top-notch performer," he was terminated due to his  "affirmative misconduct, and the lack of trust that misconduct has engendered."  *Id*.  As examples of misconduct, the letter states that Dodrill was not "adhering to normal company hours," was often not found "at home working during the day," "failed and refused to comply with directives," and "passed on sales leads generated by Pulse" to PWC.  *Id*.  According to Rosato and Madigan, Dodrill preferred to develop more business with current customers (large medical device manufacturers), rather than comply with Pulse's strategic plan to develop new customers and target different market segments in order to diversify its portfolio.

The letter allowed Dodrill 21 days to evaluate and sign the Severance Agreement, although he was not required to do so.  The Severance Agreement provides an effective date of November 15, 2005, a severance payment of $7,500.00, and reaffirms the restrictive covenants of the Employment Agreement, as follows:

> You understand that you and the Company are parties to an Employment Agreement [containing Restrictive Covenants] which place certain restrictions on you . . . after your employment ends (the "Restrictive Covenants").  In particular, Paragraphs 6, 7, 8, and 9 of the Employment Agreement contain certain restrictions with respect to the protection of the Company's "Confidential Information" . . . , your ability to work for a competitor of the Company, your ability to solicit or accept business from a Company customer, and your ability to solicit the Company's employees.  By accepting the Severance Payment and executing this Agreement, you are hereby ratifying and reaffirming your agreement to be bound by the Restrictive Covenants.

Exhibit 10, ¶ 10.

The termination letter specifically cautioned that the restrictive covenants of the Employment Agreement "are binding upon you whether or not you decide to sign the Severance

Agreement." Exhibit 9. Rosato also discussed the effect of the restrictive covenants on Dodrill.

After unsuccessfully requesting a greater amount of severance pay and after reviewing the

Severance Agreement with his attorney, Dodrill signed it on December 5, 2005. Pulse then paid

Dodrill the $7,500 severance payment. Exhibit 12.

In January 2006, Dodrill formed Dodrill & Associates, Inc., which independently

represents manufacturing companies of various commodities for the medical device industry. He

now represents five such companies; one is based in Sweden and the remaining four are located

in the Western or Upper Midwestern United States. Four of the companies are not direct

competitors of Pulse because they do not sell machined components. PWC (Dodrill's prior

employer) sells precision wire and grinding equipment; Medical Rubber sell rubber components;

R&L Spring sells coils and springs; and Pulse Systems sells laser cut products. Pulse became

aware of Dodrill's new business venture in March 2006 at a trade show in Germany and was not

concerned about his representation of those four manufacturers. However, Dodrill did not

disclose to Pulse that he had just signed on March 1, 2006, a Sales Representative Agreement

with RMS, a direct competitor of Pulse.[2] Exhibit 15. Dodrill added RMS as one of his

representative manufacturers because he is at a competitive disadvantage unless he is able to

offer a package of different manufacturers, including one that makes machined components.

RMS is much bigger than Pulse with annual sales of about $90-100 million, in contrast to

Pulse's annual sales of $23 million in 2006 (and closer to $30 million currently). By September

2006, Pulse learned of Dodrill's relationship with RMS and his active solicitation of its

customers in the Western United States and demanded that he cease violating the restrictive

---

[2] Dodrill testified that this document was executed after he returned from Germany and was backdated, but did not explain why it was backdated. Presumably the date reflects when Dodrill began performing work for RMS.

9 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

covenants.  Exhibit 13.  Pulse has since learned through discovery that Dodrill has released other confidential information concerning its sales and pricing to one of its customers.  Exhibit 19. Pulse believes that existing and/or potential sales are now going to RMS through Dodrill's efforts of targeting its existing customers and using confidential information.  Exhibits 20, 31.

Dodrill sells to his long-established customers, all of whom are in the Western United States and some of whom are also customers of Pulse.  Although he is attempting to obtain business from these customers, he is not attempting to replace Pulse's existing contracts or pending bids for specific parts and has rejected customers' requests to handle that business. Instead, he is only seeking new business for parts which were not in the bid process at Pulse when he was working there.  In 2006, Dodrill booked sales of part with upwards of $320,000 in commission, but nets less than $120,000 annually.

## CONCLUSIONS OF LAW

### I.  Applicable Law – Interpretation and Construction of the Covenants

"In diversity cases, the district court normally applies the substantive law of the forum state, including its choice of law rules."  *Nelson v. Int'l Paint Co.*, 716 F2d 640, 643 (9th Cir 1983), citing *Klaxon Co. v. Stentor Elec. Manuf. Co.*, 313 US 487 (1941).  This case was transferred to the District of Oregon under 28 USC § 1406(a), based on a finding that venue was not proper in the Eastern District of Pennsylvania.  Despite that procedural posture, "[w]hen a transfer for improper venue is granted pursuant to § 1406(a), then 'regardless of which party requested the transfer or the purpose behind the transfer, the transferee court must apply the choice of law rules of the state in which it sits.'"  *Manley v. Engram*, 755 F2d 1463, 1467 (11th

Cir 1985), quoting *Ellis v. Great Southwestern Corp.*, 646 F2d 1099, 1110 (5th Cir 1981) (cited

with approval in *Muldoon v. Tropitone Furniture Co.*, 1 F3d 964, 967 (9th Cir 1993)); *see also*

*Nelson*, 716 F2d at 643.  Thus, this court applies forum law, including Oregon's choice of law

rules, in deciding the present motion.

Under Oregon law, subject to certain exceptions not applicable here, "the contractual

rights and duties of the parties are governed by the law or laws that the parties have chosen."

ORS 81.120(1); *see M+W Zander, U.S. Operations, Inc. v. Scott Co. of Cal.*, 190 Or App 268,

271-72, 78 P3d 118, 121 (2003), citing *Machado-Miller v. Mersereau Shannon, LLP*, 180 Or

App 586, 592, 43 P3d 1207, 1210 (2002).  Here, both the Employment Agreement (¶ 11) and the

Severance Agreement (¶ 16) provide that Pennsylvania law applies to the construction of those

agreements.  Thus, this court will apply Pennsylvania law in considering the interpretation and

construction of the terms of the Employment Agreement and the Severance Agreement.

## II.  Preliminary Injunction Standard

"It is so well settled as not to require citation of authority that the usual function of a

preliminary injunction is to preserve the status quo *ante litem* pending a determination of the

action on the merits."  *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F2d 804, 808 (9th Cir), *cert*

*denied*, 375 US 821 (1963).  However, it is an "extraordinary and drastic remedy, one that

should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."

*Mazurek v. Armstrong*, 520 US 968, 972 (1997) (citation omitted, emphasis in original).

The Ninth Circuit recognizes two different sets of criteria for injunctive relief.  Under the

"'traditional test,' the moving party must show:  '(1) a strong likelihood of success on the merits,

(2) the possibility of irreparable injury to the plaintiff if preliminary relief is not granted, (3) a

balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain

cases).'" *Southeast Alaska Conservation Council v. United States Army Corps of Engineers*, 472

F3d 1097, 1100 (9th Cir 2006) (internal quote marks and citations omitted).  The "'alternative

test' requires that the moving party demonstrate 'either a combination of probable success on the

merits and the possibility of irreparable injury or that serious questions are raised and the balance

of hardships tips in [the moving party's] favor.'" *Id* (internal quote marks and citations omitted).

"These two formulations represent two points on a sliding scale in which the required degree of

irreparable harm increases as the probability of success decreases.  They are not separate tests

but rather outer reaches of a single continuum." *Save Our Sonoran, Inc. v. Flowers*, 408 F3d

1113, 1120 (9th Cir 2005) (internal quotation marks and citation omitted).

## III.  Likelihood of Success on the Merits

### A.  Validity and Enforceability of the Restrictive Covenant

In order to be enforceable in the employment context, a restrictive covenant must:

(1) relate to (be ancillary to) the contract for employment and be supported by adequate

consideration; (2) be reasonably necessary to protect the employer; and (3) be reasonably limited

in both duration and geographic scope.  *Siemens Med. Solutions Health Servs. Corp. v.

Carmelengo*, 167 FSupp2d 752, 760 (ED Pa 2001) (citation omitted); *Insulation Corp. of Am. v.

Brobston*, 446 Pa Super 520, 528-29, 667 A2d 729, 733 (1995).  The challenger to enforcement

of a noncompetition covenant bears the burden of proving that the terms of restrictive covenants

are not supported by consideration and/or are unreasonable.  *John G. Bryant Co. v. Sling Testing

& Repairs, Inc.*, 471 Pa 1, 12, 369 A2d 1164, 1169-70 (1977) (citations omitted).

Dodrill concedes that the restrictive covenants at issue are ancillary to his Employment Contract with Pulse and were supported by adequate consideration. However, he raises three separate challenges to enforcement of the restrictive covenants. First, he argues that two phrases in the covenants are too vague to be enforced. Even if those terms are sufficiently definite to be enforced, he also argues that the restrictive covenants are not reasonably necessary to protect Pulse and are not sufficiently limited in geographic scope.

### 1. **Vague and Indefinite Terms**

The first challenge raised by Dodrill is that several of the terms in the restrictive covenants are too vague and indefinite to be enforced. Specifically, Dodrill argues that the terms "customer base" in the noncompetition clause (¶ 9(b)) and the terms "customers or prospective customers" in the nonsolicitation clause (¶ 9(c)) are too vague and indefinite to be enforced.

The terms "customer base," "customers," and "prospective customers" are not defined in Employment Agreement. Because those terms could include any individual or entity conducting business in the relevant industry, Dodrill argues that there is no way he can identify Pulse's "customers" or "prospective customers." Thus, he concludes that these terms are too vague and indefinite to be enforced.

As interpreted in Pennsylvania, the term "customer" is not too indefinite to be enforced, but, when standing alone, does include the requirement of a present contractual relationship between a provider of goods or services:

> The dictionary definitions of 'customer' . . . envision a continuing rather than a completed relationship between buyer and seller. Because both dictionary definitions use present tense verbs, the clear implication is that the relationship must exist in the present rather than in the past. Similarly, when used in statutes, the term

> 'customer' is usually defined as an entity having a current
> contractual relationship with a provider of goods or services.

*Doyle Consulting Group, Inc. v. Stoffel*, 2004 WL 362316 *2 (Pa Com. Pl. Feb. 13, 2004), *aff'd*

869 A2d 18 (Pa Super 2004) (citations omitted).

In *Doyle*, the court construed the term "customer" used in a non-solicitation clause not to

include a former customer with whom the employer had no current business relationship, but

noted that the employer could have avoided that result had it more broadly worded the provision:

> If [plaintiff] had wanted the Non-Solicitation Clause to apply to its
> former customers, it could easily have worded the provision more
> broadly and explicitly to ensure that its intent was unambiguous
> and unmistakable.  In other cases where courts have barred former
> employees from soliciting former customers of their former
> employer, the non-solicitation clause included a definition of the
> term "customer" that expressly covered all entities who were
> customers at some point during the terminated employee's tenure
> with the employer.

*Id* at *3 (citations omitted).

Pulse has done just that in this case by prohibiting doing business with any "customer . . .

who was a customer . . . on the date of [Dodrill's] termination . . . or at any time within two (2)

years prior to that date."  Employment Agreement, ¶ 9(c).

The issue is what the addition of the term "prospective customer" adds to this clause.

Given that Dodrill is making an affirmative effort to avoid soliciting any business that was in the

bid process at Pulse when he left, he has evidenced his ability to identify who was a "prospective

customer on the date of termination."  Therefore, the terms "customer" and "prospective

customer," which appear only in the non-solicitation clause (¶ 9(c)), are not sufficiently vague to

be unenforceable.

The term "customer base" appears only in the definition of the term "Restricted Business" in the noncompetition clause (¶9 (b)).  Dodrill concedes "there is a mostly fixed client base" in the "medical component contract manufacturing" industry.  Dodrill Aff (docket #39), ¶ 8.  Pulse described these businesses as about a dozen well-known large OEMs, although customers could include the hundreds of small OEMs.  More importantly, Dodrill also avers that "[while an occasional new provider or equipment manufacturer will arise, *the majority of the businesses purchasing medical components are static in number and identity*" and that from the beginning of his "entry into this area of business . . . [he has] *worked with primarily the same group of potential clientele*."  *Id*, ¶¶ 9-10 (emphasis added).  This is tantamount to an admission that the "customer base" is well known to him.  Furthermore, according to Dodrill, very few new providers or manufacturers enter the medical component contract manufacturing industry over time.

Thus, this court finds that neither the noncompetition or nonsolicitation clauses contain vague or unenforceable terms.

///

///

## 2. Reasonably Necessary to Protect the Former Employer

Under Pennsylvania law, "[p]ost-employment restrictive covenants are subject to a more stringent test of reasonableness than covenants ancillary to the sale of a business." *Brobston*, 446 Pa Super at 529, 667 A2d at 733.  This "heightened scrutiny stems from a historical reluctance . . . to enforce any contract in restraint of free trade, particularly where they restrain an individual from earning a living at his trade." *Id*.

Although recognizing that it was "not controlling authority," the Superior Court of

Pennsylvania has cited the following excerpt from an Ohio case as "illustrative of the level of

scrutiny to which these covenants must be subjected:"

> In treating undue harshness and oppression, the courts focus a
> great deal of attention on such inquiries as:  What is the situation
> of the employee and his family?  What is employee's capacity?  Is
> employee handicapped or disabled in any way?  What effect will
> the restraint have on the employee's life?  Will it deprive him of
> opportunity of supporting himself and his family in reasonable
> comfort?  Will it force him to give up the work for which he is best
> trained or expatriated?  What are business conditions?  Is there
> prevailing unemployment?  Was the employment terminable at the
> employer's will?  Did employee work for employer for a very brief
> time?  What were the circumstances of termination of the
> employment?  Did the termination constitute a breach of contract
> by the employer?  If not a breach, was it unreasonable?  What is
> the character and extent of consideration to employee?

*Brobston*, 446 Pa Super at 536, 667 A2d at 737, quoting *Arthur Murray Dance Studios of*

*Cleveland, Inc. v. Witter*, 105 NE 2d 685, 700, 62 Ohio Law Abs 17 (Ohio Com. Pl. Feb. 28,

1952) (internal quote marks and ellipses omitted).

The "circumstances under which the employment relationship is terminated" is affect

both the legitimacy of the employer's interests and the degree of hardship imposed upon the

departing employee" and, as such, is an "important factor to consider in assessing both the

employer's protective interests and the employee's ability to earn a living."  *Brobston*, 446 Pa

Super at 535-36, 538, 667 A2d at 737.  Where an employee does not leave employment

voluntarily, broad language in a covenant not to compete "must be viewed in an especially

critical light."  *Coventry First, LLC v. Ingrassia*, 2005 WL 1625042, *9 (ED Pa July 11, 2005).

The rationale for this perspective is that the employer who fires an employee has already

determined that the employee's deficiencies outweigh his or her strengths, so any claim that the employee "poses a serious competitive threat is inherently suspect." *Id.*

Dodrill relies heavily on *Brobston* and *Coventry First* as authority for his position that the restrictive covenants are subject to heightened scrutiny because Pulse terminated him. In *Brobston*, the defendant had worked in the insulation industry for five years before being hired by the plaintiff. He then worked for 10 years for the plaintiff and was fired for failing to increase sales, failing to take overnight sales trips, and failing to report sales calls and expenses. In *Coventry First*, the defendant was fired after about a year and a half for producing an inadequate level of business. Citing *Brobston*, the court found inherently suspect Coventry's claim that the defendant posed a serious competitive threat.

Unlike the defendants in *Brobston* and *Coventry Health*, Dodrill was not fired for failing to meet Pulse's sales goals. To the contrary, the parties agree that Dodrill was a "top-notch performer" in terms of generating sales and was terminated despite completing contracts which would result in Pulse receiving over $16 million in revenue in 2006. Exhibit 9; Dodrill Aff (docket #39), ¶ 15. *Brobston* and *Coventry Health*, are premised upon the common sense notion that it is incongruous to allow an employer to deem a former employee both "worthless" and at the same time a competitive threat:

> The employer who fires an employee for failing to perform in a manner that promotes the employer's business interest deems the employee worthless. Once such a determination is made by the employer the need to protect itself from the former employee is diminished by the fact that the employee's worth to the corporation is presumably insignificant. Under such circumstances, we conclude that it is unreasonable as a matter of law to permit the employer to retain unfettered control over that which it has effectively discarded as worthless to its legitimate business interests.

          \*       \*       \*

> It bears noting that there is a significant factual difference between the hardship imposed by the enforcement of a restrictive covenant on an employee who voluntarily leaves his employer and that imposed upon an employee who is terminated for failing to do his job. The salesman discharged for poor sales performance cannot reasonably be perceived to pose the same competitive threat to his employer's business interests as the salesman whose performance is not questioned, but who voluntarily resigns to join another business in direct competition with the employer.

*Brobston*, 446 Pa Super at 532-35, 667 A2d at 735-36 (footnotes omitted).

Unlike the position taken by those employers, Pulse took the position that Dodrill was a "top-notch performer" in terms of sales, but had to be terminated because of alleged misconduct that engendered a loss of trust. Therefore, Dodrill's restrictive covenants need not be subjected to any heightened scrutiny.

The nonsolicitation clause bars Dodrill from interfering or attempting to interfere with any of Pulse's customer or prospective customers. Similarly, the noncompetition clause bars Dodrill from engaging in any business which engages in "contract manufacturing of machine components." As Pulse freely admits, its direct competitors are only those 15 or so businesses which sell machined components to OEMs in the medical field and not many other business which sell other types of components such as rubber, precision wire, or laser cut components to the same OEMs. A covenant should be drawn "only as broadly as is necessary to protect [the employer]'s legitimate business interests." *Coventry First*, 2005 WL 1625042 at \*8 (citations omitted). Trade secrets, confidential information, customer goodwill and specialized training and skills are legitimate business interests entitled to protection. *Thermo-Guard, Inc. v. Cochran*, 408 Pa Super 54, 65, 596 A2d 188, 193-94 (1991). Here the restrictive covenants are unnecessarily broad by prohibiting Dodrill not only from engaging in the same or similar

18 -  FINDINGS OF FACT AND CONCLUSIONS OF LAW

business as Pulse, but also from engaging in a business which poses no competitive threat to Pulse. In fact, Pulse allowed Dodrill to represent four manufacturers who are not direct competitors without claiming a violation of the restrictive covenants. Only when Pulse learned that Dodrill represented RMS did Pulse take action.

Accordingly, for the purposes of the pending motions, this court narrows the restrictive covenant to permit Dodrill to represent manufacturers of medical device components which do not directly compete with Pulse by manufacturing machined components.

### 3. **Duration and Geographic Scope**

Both restrictive covenants are for a period of two years from the date of termination of Dorill's employment. Dodrill does not contest the reasonableness of a two year duration.

However, Dodrill does contest the nationwide scope of both restrictive covenants. Although Pulse is a national company, Dodrill claims that this geographic scope is too large since he primarily serviced Pulse's customers only in the Western United States. Nationwide non-compete restrictions are enforceable where the former employer does business on a nationwide scale. *National Bus. Serv., Inc. v. Wright*, 2 F Supp2d 701, 708 (ED Pa 1998). As noted by one court, "this has typically occurred in cases whether the employee *actually serviced a nationwide market*." *Coventry First*, 2005 WL 1625042 * 9 (emphasis in original) (citations omitted).

Dodrill did not service a nationwide market, but managed one of three geographic regions for Pulse. However, in contrast to *Coventry First*, there is sufficient evidence that Dodrill could cause Pulse harm beyond the Western and Upper Midwestern United States. Dodrill was an excellent salesperson with access to trade secrets and confidential information

applicable to any potential customer of Pulse, regardless of geographic location.  It also appears

that at least some of Dodrill's customers at Pulse were national companies with facilities in

several different locations, including locations outside Dodrill's region.  Thus, this court finds

that the geographic scope of the restrictive covenants is reasonable.

**B.  Breach of Restrictive Covenants**

Dodrill characterizes his new business as a fresh start involving new products and new

suppliers.  He asserts that the "contracts which [he] put in place with [his] customers for Pulse

were contracts for specific part numbers" and that those "contracts are still in place and Pulse

still has that business."  Dodrill Aff (docket #13), ¶¶ 69-70.  He also avers that he has "not

attempted to reduce or interfere with those Pulse contracts for those part numbers" and instead

has "sought contracts only for new and different part numbers."  *Id*, ¶¶ 71-72.  His primary

contention is that he has not interfered with Pulse's existing client relationships.

However, Dodrill is attempting to obtain the same business for RMS that he would have

tried to obtain for Pulse had he remained employed at Pulse, namely bids for new machined

components.  Comparing the provisions in the restrictive covenants, as modified, with the

conduct described at the hearing, Pulse has met its burden to demonstrate a strong likelihood of

proving that Dodrill has violated his Employment Agreement and Severance Agreement by:

(1) working as a manufacturer's representative for RMS, a direct competitor of Pulse;

(2) soliciting Pulse's customers and prospective customers on behalf of RMS; and (3) using or

being in a position inevitably to use Pulse's confidential information to benefit himself and

RMS.

**IV.  Possibility of Irreparable Injury to Pulse**

Over a year after Dodrill first formed a relationship with RMS, Pulse cannot ascertain whether it has lost any business to date because of Dodrill's representation of RMS. While Dodrill purports not to solicit business for RMS for the same part numbers as Pulse, he has obtained a contract for crimps and DF-1 Connectors with one of Pulse's customers. Exhibit 21. Without knowing the specific parts number, Pulse cannot prove that it currently makes these parts for that customer. However, those parts are similar to other parts that Pulse manufactures. Pulse would be capable and desirous of obtaining a contract from an existing customer for these same new parts.

Thus, Pulse will likely lose business and customers if Dodrill is not enjoined from soliciting customers for the benefit of himself and Pulse's direct competitors, including RMS. Specifically, without injunctive relief, Pulse will suffer irreparable harm, including: (1) damage to its customer relationships and customer goodwill; (2) the exploitation of its goodwill to benefit Dodrill and its competitors; and (3) having to compete against the significant investment it made in Dodrill and that it contracted to protect for two years. Furthermore, Dodrill agreed that violations of the restrictive covenants would "cause interference with [Pulse's] business operations as well as with [its] clients and prospective clients" and that "any such interference will cause irreparable harm to [Pulse]." Employment Agreement, ¶ 9(g).

## V. **Balance of Hardships to Dodrill**

Entry of a preliminary injunction would force Dodrill to cease working for RMS and instead work only for the other four manufacturers which he represents. Based on customer preference, it is much easier and more remunerative for him to represent a package of component manufacturers, including a manufacturer of machined components such as RMS. Although

representing a machined component manufacturer is not necessary to survival of his new business venture, Dodrill will likely suffer some loss of potential income for the duration of the restrictive covenant.  Even so, he will suffer less harm if a preliminary injunction is granted than Pulse will suffer it is not granted.

## VI.  Advancement of the Public Interest

Granting a preliminary injunction will protect the important public interest of enforcing a contract which the parties entered into voluntarily.  It also will restrain the unlawful conduct by Dodrill and preserve the *status quo* that existed before he formed a relationship with RMS. Dodrill has pointed to no public interest favoring non-enforcement of the restrictive covenants.

## VII.  Bond

"No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have wrongfully enjoined or restrained."  FRCP 65(c).  This court anticipates that it can set a hearing on the claims alleged in Pulse's Complaint within six months.  Dodrill is currently earning income (commissions less expenses) of  approximately $10,000 per month.  If Dodrill was unemployed for a period of six months, he would lose approximately $60,000 of income.  However, not all of that lost income is attributable to his representation of RMS.  Estimating on the conservative side in favor of Dodrill, this court concludes that a bond of $40,000 should be sufficient to compensate him for his costs and damages should this injunction have been improvidently granted.

### ORDER

The court finds that Pulse has established its entitlement to a preliminary injunction. Accordingly, Pulse's Motion for Preliminary Injunction (docket #2) is GRANTED and Dodrill is enjoined from:

(1) engaging, either directly or indirectly, in any manner or capacity, in any business which directly competes with Pulse in the contract manufacturing of machine components with a customer base predominately in the medical field anywhere in the United States; and

(2) alone, or in any capacity with another, directly or indirectly, canvassing, soliciting, servicing, accepting business from, doing business with, or in any way interfering or attempting to interfere with any customer or prospective customer of Pulse as of November 15, 2005, or at any time within two years prior to that date, for the benefit of any business which directly competes with Pulse in the contract manufacturing of machine components with a customer base predominately in the medical field anywhere in the United States.

Pulse shall prepare and submit to the court a form of preliminary injunction specifically identifying by name those businesses (numbering approximately 15) which are its direct competitors. In addition, pursuant to FRCP 65(c), this court imposes a bond in the amount of $40,000.00.

DATED this 14th day of March, 2007.

/s/ Janice M. Stewart__
Janice M. Stewart
United States Magistrate Judge

23 -  FINDINGS OF FACT AND CONCLUSIONS OF LAW